**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Jean Ritter,<br>Dennis Webster,<br>Robert Jastrzab,<br>Randy Feldman,<br>Susan Sheuerman,<br>Chris Moen,<br>Paul F. Banta,<br>and<br>James Herrick,<br><br>          Petitioners,<br><br>     v.<br><br>United States Department of Justice,<br><br>          Respondent. | Misc. Case No. 02-127 |

**PETITIONERS' RESPONSE TO UNITED STATES' PETITION
TO ENFORCE THE CIVIL INVESTIGATIVE DEMANDS AND
INCORPORATED REPLY TO UNITED STATES' OPPOSITION
TO PETITION TO SET ASIDE CIVIL INVESTIGATIVE DEMANDS**

**I.     INTRODUCTION**

Unsupported by any evidence in any form, and ignoring the Constitution and laws of the United States, the government invites the Court to punish the Petitioners for their exercise of rights guaranteed by law. Despite the fact that the False Claims Act explicitly provides for challenges to the government's issuance of Civil Investigative Demands ("CIDs"), and the fact that the Constitution provides for a judiciary independent of the executive branch to review such challenges, the government repeatedly urges the Court to summarily deny Petitioners' challenge based on the assertion that the Attorney General personally issued the CIDs. The suggestion to the Court that the Attorney General can never be wrong is obviously not a basis for enforcing the

CIDs. This suggestion is especially ironic in the context of the Attorney General permitting his appointed false claims investigator, Assistant United States Attorney ("AUSA") James G. Sheehan, to engage in a constant and withering public attack on the pharmacy benefits management ("PBM") industry.

In making its arguments, the government ignores the misconduct of AUSA Sheehan, disregards its consistently unreasonable demands on Petitioners and AdvancePCS, Inc. ("AdvancePCS"), and fails to admit that the protracted litigation regarding its investigation is of its own making. The government mischaracterizes the facts, law, and Petitioners' argument, and ignores Third Circuit precedent regarding the False Claims Act. Instead, the government permits AUSA Sheehan to improperly influence the securities markets through reckless and baseless accusations of alleged PBM misconduct, and further proffers no legitimate theory of false claim liability, and as such, has acted with improper motive. Petitioners are not seeking determination of the merits of a False Claims Act violation, but rather respectfully urge the Court to recognize the government's improper motive and set aside the CIDs on that basis.

## II.     THE GOVERNMENT SUBSTANTIALLY MISSTATES THE FACTS

Although the government's version of the history of this matter is largely irrelevant to the issue before the Court regarding the CIDs, the government substantially misstates the facts in certain material respects which require clarification as follows:

A.      The government asserts that since its investigation began it "has not received a single document . . . or information . . . without bringing an enforcement action." *See Memorandum of Law in Support of United States' Petition to Enforce the Civil Investigative Demands and Opposition to Petitioners' Petition to Set Aside CIDs* ("*Third Enforcement Petition*") at p. 2. The government's assertion is incorrect in multiple respects.

2

First, in early 2000, PCS Health Systems, Inc. ("PCS"), a predecessor company of AdvancePCS, voluntarily submitted a lengthy memorandum to the government to assist the government in understanding PCS's structure and business practices. The General Counsel of PCS met with the government and offered to answer any questions regarding the memorandum and to provide additional information if necessary. *See* Exhibit 1, *Supplemental Declaration of Susan deMars* at ¶ 4; Exhibit 2, *Letter of March 3, 2000, from Barbara Rowland to Eugene Tillman*. Additionally, PCS voluntarily provided the government with several versions of a contract template used by PCS for its rebate agreements with manufacturers. *See* Exhibit 3, *Letter of May 2, 2000, from Eugene Tillman to Barbara Rowland*.

Second, PCS expended substantial resources to generate a voluminous sample of financial records evidencing receipt of rebates from manufacturers and payment of those rebates to health plan customers to assist the government in determining what data was necessary to its investigation. Despite the fact that the government reviewed those records in April 2000, the government has never requested that AdvancePCS produce *any* additional rebate data. *See* Exhibit 1, *Supplemental Declaration of Susan deMars* at ¶ 5; Exhibit 4, *Letter of March 19, 2001, from Eric A. Dubelier to Barbara Rowland* at Items 8-12 and 20. The absence of such a request is particularly ironic given the government's repeated and conclusory allegations of the existence of "secret" payments.

Third, despite the fact that PCS agreed in May 2000 to produce a large number of documents pursuant to a Health and Human Services Office of Inspector General ("HHS-OIG") subpoena, the government refused to agree to a protective order and instead filed its first enforcement petition. *See* Exhibit 1, *Supplemental Declaration of Susan deMars* at ¶ 6; Exhibit 5, *Letter of May 19, 2000, from Eric A. Dubelier to Barbara Rowland*. Following the response

3

from PCS, the government signed the protective order proffered by PCS containing terms identical to the terms it had previously rejected. In other words, there was no need or basis for the enforcement petition that the government elected to file.

Finally, AdvancePCS has repeatedly offered to provide information in response to any reasonable request of the government. *See* Exhibit 4, *Letter of March 19, 2001, from Eric A. Dubelier to Barbara Rowland*; Exhibit 6, *Letter of June 4, 2001, from Jacqueline E. Bennett to Barbara Rowland*; Exhibit 7, *Letter of October 12, 2001, from Eric A. Dubelier to Barbara Rowland*.

B. The government claims that the November 1999 HHS-OIG subpoena was issued in connection with its "ongoing investigation of AdvancePCS's receipt of drug manufacturer rebates and other secret payments." *See Third Enforcement Petition* at p. 3. To the contrary, in February 2000, the government explicitly advised PCS that it was conducting an "inquiry" of the PBM industry generally, that PCS was a "topic" of that inquiry, and that the government was not in possession of any information that PCS had violated any federal law. *See Supplemental Declaration of Susan deMars* at ¶ 3. Moreover, the government made no mention of any alleged "secret payments" in its first enforcement petition. *See Petition for Summary Enforcement of an Administrative Subpoena Duces Tecum*, Misc. Case No. 00-133.

C. The government claims that it was advised for the first time in March 2001 that AdvancePCS would not produce electronic mail in response to the HHS-OIG subpoena. *See Third Enforcement Petition* at 4. In fact, as the government is well aware, the government agreed that only the document files maintained by contracting employees principally responsible for negotiating manufacturer contracts would be included in the initial production. *See* Exhibit 4, *Letter of March 19, 2001, from Eric A. Dubelier to Barbara Rowland* at Item 7.

4

D. The government suggests that a conflict of interest exists in counsel for AdvancePCS representing Petitioners in this matter. *See Third Enforcement Petition* at p. 2, n.2; p. 14, n.5. At the same time, the government admits that when it originally was interested in interviewing the Petitioners, including several *former employees* of AdvancePCS, it contacted and negotiated directly with undersigned counsel. *See Third Enforcement Petition* at pp. 5-7. At no time during that negotiation did the government ever inform undersigned counsel that a potential conflict of interest existed in undersigned counsel advising the potential witnesses.[1]

Moreover, despite the government's earlier assurance to undersigned counsel that the Petitioners were "witnesses," *see Third Enforcement Petition* at Ex. 9, the government now suggests that Petitioners have knowledge of and participated in arrangements for alleged "secret payments" from manufacturers to AdvancePCS in violation of the False Claims Act. *See id*. at 12.

### III. THE GOVERNMENT ISSUED THE CIDs WITH IMPROPER MOTIVE

#### A. The False Claims Investigator Continues His Improper Public Comments Regarding the Investigation

The Department of Justice, through AUSA Sheehan, its appointed false claims investigator, has continued its improper public comments and attack on the PBM industry in an effort to force industry compliance with its investigatory demands. This conduct is critical to the Court's consideration of improper purpose in issuing the CIDs. *See United States v. Westinghouse Elec*., 788 F.2d 164, 166-67 (3d Cir. 1986).

---

[1] Significantly, the government does not contend that undersigned counsel's representation of Petitioners in this matter presents an actual conflict of interest. Moreover, the government refuses to provide the basis for its assertion of potential conflict. *See* Exhibit 8, *Letter of June 11, 2002, from Barbara Rowland to Eric A. Dubelier*.

On April 24-26, 2002, AUSA Sheehan made a presentation to the Prescription Drug Utilization Management Conference in Scottsdale, Arizona.[2] *See* Exhibit 9, *AUSA Sheehan's Outline*.[3] AUSA Sheehan's presentation recited a laundry list of "problems that PBMs have with the U.S. Attorney's Office," including standard industry practices which are the focus of the investigation relating to the CIDs, such as rebate negotiations and therapeutic intervention. *See* Exhibit 10, *Transcript of AUSA Sheehan's Remarks*.

More recently, only two weeks ago and notwithstanding the pendency of this proceeding, on June 4, 2002, AUSA Sheehan participated in a teleconference sponsored by Salomon Smith Barney to address legal issues relating to the PBM industry. *See* Exhibit 11, *Agenda of Salomon Smith Barney Program*.[4] AUSA Sheehan's meandering written materials submitted for the teleconference again list numerous issues including rebates and therapeutic intervention, which the Department of Justice maintains is the focus of the CIDs. *See* Exhibit 12, *AUSA Sheehan's Outline*.[5] It is clear from AUSA Sheehan's comments and the questions at the end of the

---

[2]   AUSA Sheehan was assisted by Cathy Y. Thomer, a person identified as a "Consulting Attorney" of the United States Attorneys Office. While Ms. Thomer *is not* a federal prosecutor, she has been actively involved in AUSA Sheehan's PBM investigation.

[3]   This document contains a notation on the *bottom of the last page* indicating that the opinions expressed therein are those of AUSA Sheehan and Ms. Thomer, not the Department of Justice. This disclaimer is implausible in two respects. First, the document contains the same accusations that form the basis of the government's PBM investigation. Second, *on the first page*, the document prominently identifies AUSA Sheehan and Ms. Thomer as employees of the United States Attorney's Office.

[4]   While the program was conducted under the auspices of the American Health Lawyers Association ("AHLA"), on information and belief, the program was originally conceived by Salomon Smith Barney for institutional investors and analysts who follow the PBM industry. The program was postponed from its original scheduled date, and was posted on the AHLA website only a few days prior to the date the program was held.

[5]   This document contains the same meaningless and confusing disclaimer of Department of Justice involvement; however, once again, the materials prominently identify AUSA Sheehan as an employee of the United States Attorney's Office.

program that the program was designed for and attended by stock analysts who follow the market in PBM industry securities. *See* Exhibit 13, *Transcript of AUSA Sheehan's Comments*.[6]

AUSA Sheehan has repeatedly spoken as a representative of the Department of Justice to stock analysts and health care industry members who evaluate and conduct business with PBMs. *See AdvancePCS's Response to Renewed Petition For Summary Enforcement of Administrative Subpoena Duces Tecum and Incorporated Motion to Quash*, pp. 8-13, filed in *United States v. AdvancePCS*, Misc. Case No. 00-133 (E.D. Pa.). Such conduct during the pendency of this investigation can have no other purpose than the improper motive of coercing Petitioners into compliance with the Department of Justice's view of PBM business practices. The Department of Justice has no legitimate role in, or the authority to dictate, federal health care policy.[7]

### B. The Department of Justice Acted With Improper Purpose and Motive in Issuing the CIDs

#### 1. The Government Must Show Its Investigation Is Legitimate

In reviewing an administrative subpoena, a "district court's role is not that of a mere rubber stamp, but of an independent reviewing authority called upon to insure the integrity of the proceeding." *FDIC v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (citing *Wentz v. FTC*, 616 F.2d 662 (3d Cir. 1980)). *See also United States v. Powell*, 379 U.S. 48, 58 (1964) (because it is the

---

[6] This transcript contains AUSA Sheehan's program remarks and comments during the question and answer session that followed the program. The transcript does *not* contain the remarks made by other speakers during the program, other than those made during the question and answer session.

[7] Moreover, as AdvancePCS has previously explained, the position of the Department of Justice is fundamentally at odds with the position of the Department of Health and Human Services, the agency that is responsible for establishing federal health care policy. *See AdvancePCS's Response to Renewed Petition For Summary Enforcement of Administrative Subpoena Duces Tecum and Incorporated Motion to Quash*, pp. 13-17, filed in *United States v. AdvancePCS*, Misc. Case No. 00-133 (E.D. Pa.).

court's process that is invoked to enforce the administrative summons, a court may not permit its process to be abused).

Contrary to the government's assertion, Petitioners in this matter do not seek to require the government to prove or even allege the elements of a false claim. However, the government is without legal authority to issue a False Claims CID unless there exists at least a *conceivable* False Claims Act violation. *See, e.g., Associated Container Transp. (Australia) Ltd. v. United States,* 502 F. Supp. 505, 510 (S.D.N.Y. 1980) (if the alleged improper antitrust activities at issue are exempt from antitrust laws, the Department of Justice would lack jurisdiction to investigate the activities and the CID should be set aside), *rev'd on other grounds,* 705 F.2d 53 (2d Cir. 1983); *Equal Emp. Opp. Comm'n v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1078 (9th Cir. 2001) ("Compliance with a subpoena is a burden, and one that a person or institution that can show it is not subject to the regulatory regime in aid of which the subpoena was issued should not be required to bear.") (citing *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 491-92 (7th Cir. 1993)).[8]

None of the cases cited by the government stand for the proposition that the government can issue a false claims CID when there is no possible false claims violation. *See Third Enforcement Petition* at p. 14. Additionally, the government's reliance on *United States v. Oncology Servs. Corp.*, 60 F.3d 1015 (3d Cir. 1995), is misplaced. Just like the agency in *Oncology* was required to show that the information it sought was reasonably related to a legitimate investigation, the government is similarly obligated in this matter to show that its

---

[8] In addition to showing that the investigation is for a legitimate purpose, the government must also show -- and the court must ultimately determine -- that the inquiry is reasonably relevant to that purpose, that the information is not already in the government's possession, and that the requisite administrative steps have been followed. *See* Petitioners' Opening Mem. at p. 15; *Wentz*, 55 F.3d at 908.

purported investigation is legitimate. *Id.* at 1016, 1020. Moreover, the additional cases upon which the government relies, *see id*. at pp. 15-16, are inapposite. In *United States v. American Target Adver., Inc.*, 257 F.3d 348 (4th Cir. 2001), *Federal Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583 (D.D.C. 2002), and *Commodity Futures Comm'n v. Tokheim*, 153 F.3d 474 (7th Cir. 1998), cited by the government, the issue was solely whether the agency had statutory authority to investigate the business of the recipient of agency subpoenas.[9] Here, Petitioners do not challenge the authority of the Department of Justice to conduct a false claims investigation. Rather, Petitioners contend that the government must show, at the very minimum, that its purported investigation is legitimate, and essential to that showing is an ability to articulate some theory of false claims liability.

Moreover, the government fails to note that two of the cases it cites recognize legitimate bases proffered by the Petitioners here to attack the CIDs. *See Tokheim*, 153 F.3d at 478 (court should not enforce an administrative subpoena where the agency "is engaged in a wide-ranging fishing expedition supported by indefinite investigatory demands"); *American Target Adver.*, 257 F.3d at 355 (administrative subpoena should not be enforced where the party responsible for initiating the investigation "has done so in bad faith"). Furthermore, in *Maccaferri Gabions, Inc. v. United States*, 938 F. Supp. 311 (D. Md. 1995), cited by the government, the court recognized that improper motive was a legal basis to set aside CIDs, carefully analyzed the evidence submitted by the parties on this issue, and concluded that the CID recipients had not established such improper motive. Thus, relevant case law confirms that CIDs issued for an improper purpose, like the instant CIDs, should be set aside.

---

[9] *Houston Indus. v. Kaufman*, Civ.A.No. H-95-5237, 1996 WL 580418 (S.D. Tx. Mar. 7, 1996), did not involve a claim that no possible antitrust violation could exist, but rather, whether the recipient of the CID could successfully invoke an immunity defense to any such violation.

2. AdvancePCS Does Not Make "Claims" As Contemplated by the False Claims Act

The government argues without factual or evidentiary support that because Blue Cross Blue Shield Association ("BCBSA") and the Claims Administration Corporation ("CAC") receive federal funds, AdvancePCS's contacts with those organizations inherently involve false claims. *Third Enforcement Petition* at pp. 17-18.[10]  The government bases it argument entirely on the notion that BCBSA and CAC are contractors of the government and, as such, any claims to those entities are claims to the government for purposes of the False Claims Act.  The government is wrong because it ignores Third Circuit law and misstates the underlying facts.

AdvancePCS's contracts with BCBSA and CAC in connection with the Federal Employees Health Benefit Plan ("FEHB") are "Service Benefit Plan[s]" pursuant to 5 U.S.C. § 8903(1).  BCBSA and CAC provide comprehensive health insurance to members, including prescription drug coverage as a "supplemental benefit." *See* 5 U.S.C. § 8904 (a)(1).  Payments to BCBSA and CAC for this comprehensive insurance are from government and employee contributions.  *See* 5 U.S.C. §§ 8906 and 8909.  The government is not a party to the FEHB contracts and AdvancePCS makes no claims for payments to the government in connection with the contracts.

In *Hutchins v. Wilentz, Goldman and Spritzer*, 253 F.3d 176, 179 (3d Cir. 2001), the Third Circuit clearly held that the False Claims Act "only prohibits fraudulent claims that cause or would cause economic loss to the government."  As the court explained, the False Claims Act "is only intended to cover instances of fraud that might result in financial loss to the

---

[10]   Notably, the government makes the same statement regarding Medicaid and Medicare+Choice managed care organizations, but provides no factual description of those relationships nor any plausible theory of a false claim which would comport with the Third Circuit law.

10

government." *Id*. at 183 (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)). The government does not attempt to distinguish, or indeed even mention, this holding because it is absolutely fatal to their theory of liability in this case.

Moreover, the government's description of AdvancePCS's "three types of claims to BCBSA" is recklessly inaccurate. *See Third Enforcement Petition* at p. 17, fn. 7. AdvancePCS does not present "claims to BCBSA for prescriptions" upon which "BCBSA makes a payment determination based on specific eligibility criteria provided by AdvancePCS in each claim." *Id*. In fact, BCBSA provides the benefit information and parameters to AdvancePCS. AdvancePCS uses the information provided by BCBSA to facilitate the processing of prescriptions. This processing generally involves electronically advising the pharmacy of the coverage parameters. Every two weeks all prescriptions transmitted by pharmacies are batched and sent by AdvancePCS to BCBSA. BCBSA issues payment from its account to AdvancePCS for payment to the pharmacies that filled the prescriptions. *See* Exhibit 1, *Supplemental Declaration of Susan deMars* at ¶ 7. When BCBSA issues payment, the cost of any particular drug or prescription is absolutely irrelevant to any payment decision. Moreover, payment is made from BCBSA funds that have been previously forwarded to BCBSA in the form of a fixed premium payment for comprehensive health care insurance of which prescription drug coverage is but one component. It is not possible that these transactions would or could cause economic loss to the government because the fixed insurance premium does not vary based on the services received by a member.

In regard to fees billed to BCBSA for AdvancePCS's claim processing and benefit management services, a similar analysis applies. First, those fees are generally fixed amounts provided by contract per prescription and/or service. The payments are dependent only on the number of prescriptions and/or performance of particular services. *See* Exhibit 1, *Supplemental*

11

*Declaration of Susan deMars* at ¶ 8.  The government has not alleged, nor would there be any basis to allege, that AdvancePCS has misrepresented those numbers.  Second, again it is impossible that these payments would or could cause any economic loss to the government because BCBSA receives a fixed premium payment and is at risk for the total cost of the services.[11]

Finally, the government argues that rebate payments by AdvancePCS to BCBSA could form the basis of reverse false claims liability.  *See Third Enforcement Petition* at p. 20.  AdvancePCS regularly pays rebates to BCBSA upon receipt of the rebates from manufacturers.  Those rebates are not transmitted to the government, but rather are used by BCBSA to offset the total cost of the plan.[12]  The rebate payments made to BCBSA involve no obligation of AdvancePCS to the government.  As such, they cannot form the basis of reverse false claims liability.  *See American Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) (reverse false claims liability can only arise where false statement was made in connection

---

[11]   The government cites no legal authority for its assertion that "Congress has said it is of no significance whether the federal funding is fixed or capitated." *Third Enforcement Petition* at p. 20.  The government reads the 1986 amendments to the False Claims Act and *United States v. Azzarelli Constr. Co.,* 647 F.2d 757 (7th Cir. 1981*)* in a vacuum, and completely ignores the expressly stated law of this Circuit in *Hutchins*.  253 F.3d at 184-85 ("The proper inquiry under the False Claims Act is . . . whether the defendant causes, or will cause, the intermediary to make a false claim against the government resulting in financial loss to the treasury.").  In *Azzarelli*, the financial loss to the government was the release of funds for reimbursement to the state of Illinois.  Had the government known of the false claims submitted by the *Azzarelli* defendants, then it would not have approved the projects and the funds could have been used for other projects in which no fraud had been committed.  In contrast, no information given by AdvancePCS to BCBSA could cause financial loss to the government because the government's obligation to pay a premium is not conditioned on any particular services to members or PBM delivery arrangements.

[12]   Thus, contrary to the government's speculative theory, *see Third Enforcement Petition* at p. 18, n.7, the actual facts confirm that there is no possibility that rebates received by BCBSA could ever affect the contingency reserve of the Federal Health Benefits Fund because these rebates are the property of BCBSA.

with a preexisting debt owed *to the government*); *United States v. Q Internat'l Courier, Inc.,* 131 F.3d 770, 774 (8th Cir. 1997) (same).  *See also United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87, 94-95 (D. Maine 1996).[13]

        3.      The Government Alleges in Bad Faith That AdvancePCS Understated Rebates

In support of its baseless assertion that it has met the "false representation" requirement of the False Claims Act, *see Third Enforcement Petition* at pp. 20-21, the government maintains, *without any evidentiary support*, that PCS's former owner improperly diverted rebates transmitted by manufacturers.  The government is wrong.  Moreover, the government knows that it is wrong, and knows that AdvancePCS previously has *voluntarily provided* the Department of Justice with all information it has sought regarding this issue.  *See Petitioners' Supplemental Response* filed under seal.

Moreover, the government's assertion that the Third Circuit has not expressly decided the issue of whether materiality is an element of a false claims violation is not correct in the context of this case.  While district courts in the Circuit are split as to whether actual damages or financial loss to the government is an element of a violation of the False Claims Act, *see United States, ex rel. Brown v. Merant, Inc.*, No. CIV.A. 99-6481, 2002 WL 487160 (E.D. Pa. March 29, 2002), in *Hutchins*, *supra*, the Third Circuit held that "submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act."  253 F.3d at 184.  As explained above, AdvancePCS makes no claims to the government, and any invoices submitted to the

---

[13] It is important to note that BCBSA conducts a comprehensive annual audit of all rebates and invoicing.  *See 1999 Contract between BCBSA and PCS, Article 5 & Schedule C*.  All contracts between AdvancePCS (including its predecessors) and its customers are confidential and proprietary.  The contract is available for the Court's review upon request.

government's contractors under the circumstances set forth herein do not and cannot cause any financial loss to the government. The government has not disputed these facts nor has it offered any other theory of potential harm to the federal fisc.[14]

    4.    The Government Has Produced No Evidence To Rebut Petitioner's Evidence of Improper Motive

Petitioners have produced substantial evidence to establish improper motive by the Department of Justice in issuing the CIDs. The government's failure to respond with *any evidence* to rebut Petitioners' claims is alone a basis to set aside the CIDs. *See Chattanooga Pharm. Ass'n. v. United States Dept. of Justice*, 358 F.2d 864 (6th Cir. 1966). In fact, since *Chattanooga Pharm. Ass'n*, the Department of Justice has consistently responded to claims of improper purpose with comprehensive affidavits regarding the scope of its investigation and purpose of issuance of CIDs. *See American Pharm. Ass'n v. United States Dept. of Justice*, 467 F.2d 1290, 1291-92 (6th Cir. 1972); *RNR Enters., Inc. v. Securities & Exch. Comm'n*, 122 F.3d 93 (2d Cir. 1997); *FDIC v. Garner*, 126 F.3d 1138 (9th Cir. 1997); *United States v. Hunton & Williams*, 952 F. Supp. 843 (D. D.C. 1997); *Maccaferri Gabions, Inc. v. United States*, 938 F. Supp. 311, 314-16 (D. Md. 1995); *United States v. Witmer*, 835 F. Supp. 208, 221 (M.D. Pa. 1993); *Finnell v. United States Dept. of Justice*, 535 F. Supp. 410, 413 (D. Kan. 1982).

Even if the government had submitted evidence to support its assertions, the Court's inquiry would not be over. Contrary to the government's characterization of the law, the reviewing court must still independently determine whether an improper purpose warrants setting aside the CID. For example, in *Maccaferri*, the CID recipient set forth evidence of the improper purpose of the Department of Justice, and in response, the government filed an affidavit of an Assistant Attorney General. Nevertheless, the district court explained that "[t]his

---

[14] It is inconceivable that the government would argue False Claims Act law to the Court

Court concludes that it should not simply accept as conclusive the Antitrust Division's affidavit statements that evidence presented to see if there exists a realistic basis to believe that the requested discovery would lead to evidence which would establish an improper purpose for the CID." 938 F. Supp. at 316-17. Similarly, in this case, even had the government submitted the necessary affidavit or other evidentiary basis upon which the Court could review the propriety of the instant CIDs, which it did not, the Court is still obligated to examine each of the grounds upon which Petitioners claim improper purpose. *Id.* at 317. *See also Chattanooga Pharm. Ass'n*, 358 F.2d at 866-67 (denying enforcement of CID where the government failed to file any affidavit in response to CID recipient's allegations); *American Pharm. Ass'n*, 467 F.2d at 1291-92 (relying on affidavit submitted by Assistant Attorney General that responded to allegations of improper motive).

### IV. PETITIONERS' REQUEST FOR LIMITED DISCOVERY IS REASONABLE

Where a "respondent in a subpoena enforcement proceeding has successfully put in issue the legitimacy of the agency's purpose," discovery is permissible. *United States v. McGovern*, 87 F.R.D. 590, 591 (M.D. Pa. 1980). The government has failed to offer *any evidence* in support of its claim that the CIDs served on Petitioners should be enforced. Instead, the government proffers the Attorney General's personal exercise of authority in issuing the CIDs. As such, at a minimum, the Petitioners are entitled to know whether the Attorney General (1) has explicitly sanctioned the public attack of AUSA Sheehan on the PBM industry, (2) was advised of the related and pending litigation, Misc. Case No. 00-133, and (3) was presented with a legitimate theory of false claims liability prior to issuing the CIDs.

---

while ignoring the most recent direction from the Third Circuit on this issue.

Moreover, as demonstrated in Petitioners' Supplemental Response filed Under Seal, the government has information identified by the CIDs in its possession. Petitioners should be able to determine the extent of the information already in the government's possession. *See Securities & Exch. Comm'n v. Lavin*, 111 F.3d 921, 926 (D.C. Cir. 1997) (when circumstances indicate that further information is necessary for the courts to discharge their duty, discovery may be available) (citations and quotations omitted).

The government criticizes Petitioners' reliance on *Associated Container Transp. (Australia) Ltd. v. United States,* 502 F. Supp. 505, 510 (S.D.N.Y. 1980), *rev'd on other grounds,* 705 F.2d 53 (2d Cir. 1983). However, when the decision was on appeal to the Second Circuit, the appellate court tacitly approved the district court's discussion of the right to discovery in CID enforcement proceedings. *Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 56 (2d Cir. 1983) (citing the district court's holding that CID recipients had a right to reasonable discovery and excluding any disapproval of the lower court's holding). Moreover, the Honorable Alvin K. Hellerstein of the Southern District of New York, citing the *Associated Container* district court decision, has recently reaffirmed the principle that "[r]easonable discovery is available to a respondent to set aside or limit the CID, *as a matter of right and without leave of court*." Honorable Alvin K. Hellerstein and Gary P. Naftalis, ALI-ABA Course of Study Feb. 7-9, 2002, "Private Civil Actions and Concurrent or Subsequent Regulatory or Criminal Proceedings" at 911 (emphasis added), Exhibit 14. *See also Securities & Exch. Comm. v. Dresser Indus., Inc.*, 628 F.2d 1368, 1388 (D.C. Cir.), *cert. denied*, 449 U.S. 993 (1980) (discovery may be available where further information is necessary for court to discharge duty).

V.   **IF ENFORCED, THE COURT SHOULD SEVERELY LIMIT THE SCOPE OF THE CIDs**

The CIDs require, without limitation, testimony regarding all relationships between AdvancePCS and drug manufacturers, health plan customers and pharmacies. However, as set forth by Petitioners, and unrebutted by the government, there are only four limited situations where AdvancePCS engages in any activity remotely connected to any government funding. In three of these four situations, the government has not even attempted to articulate potential harm to the government. If enforced, the government should be strictly limited to questions only about how AdvancePCS's contacts with BCBSA, CAC, Medicare+Choice, and Medicaid could cause financial loss to the government.

Courts considering the scope of administrative subpoenas have consistently held that the requested information must be reasonably relevant to the purpose of the investigation. *See, e.g., Federal Trade Comm'n v. Anderson*, 631 F.2d 741, 745-46 (D.D.C. 1979); *Finnell*, 535 F. Supp. at 412 (enforcing CID only after finding that the relevance and materiality of the information requested was sufficiently demonstrated); *United States v. Padin*, 131 F.R.D. 21, 23 (D. P.R. 1990) (in administrative investigatory proceeding, agency should not inquire into matters unrelated to reason for investigation); *Petition of Columbia Broad. Sys., Inc.*, 235 F. Supp. 684, 688 (S.D.N.Y. 1964) (grand jury subpoenas must be relevant to the investigation being conducted). For example, in *Equal Emp. Opp. Comm'n v. United Air Lines, Inc.*, 287 F.3d 643 (7th Cir. 2002), the court refused to enforce the agency's subpoena because the subpoena requested information far beyond the scope of the underlying charge.

This requirement of reasonable relevance is consistent with the language of the CID statute, which expressly incorporates the standards set forth in the Federal Rules of Civil Procedure and makes them applicable to CID demands. 31 U.S.C. § 3733(b)(1). As explained

by the court in *United States v. Witmer*, 835 F. Supp. 201 (M.D. Pa. 1993), "the importance and function of the discovery provisions of the Federal Rules of Civil Procedure is to protect the CID recipient from discovery requests which are vexatious or overbroad." *Id.* at 205. *See also Hyster Co. v. United States*, 338 F.2d 183, 186 (9th Cir. 1964) (the safeguards afforded by Fed. R. Civ. P. 34 and 30(b) are available to CID recipients and the court has broad discretion to protect CID recipients from unreasonable demands).[15] Thus, under well-established law, where information requested is overbroad and irrelevant, a court should refuse to enforce a subpoena, *see United Air Lines, supra,* or, at the very minimum, limit the scope of the subpoena to the purpose of the investigation. *See Equal Emp. Opp. Comm'n v. Ford Motor Credit Co.*, 26 F.3d 44 (6th Cir. 1994) (limiting scope of subpoena and explaining that if Congress had meant for the agency's determination of relevance simply to be accepted by the courts it would not have provided for judicial review of the requests). Similarly, the Court in the instant matter should, at the minimum, narrow the scope of the CIDs to the four limited situations where AdvancePCS engages in any activity remotely connected to any government funding.

---

[15] In the context of other civil litigation, *see Herbert v. Lando*, 441 U.S. 153, 177 (1979) (the requirement that material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where justice requires protection for a party or person from annoyance, embarrassment, oppression, or undue burden or expense); *Morrison v. Philadelphia Hous. Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001) (denying motion to compel where plaintiff failed to meet threshold burden of demonstrating relevance of requested information); *Hall v. Harleysville Ins. Co.,* 164 F.R.D. 172, 173 (E.D. Pa. 1995) (despite broad discovery permitted by federal rules, court denied motion to compel where the information sought could not possibly lead to relevant discovery); *Hofer v. Mack Trucks, Inc.,* 981 F.2d 377, 380 (8th Cir. 1993) (despite broad scope of discovery permitted by federal rules, "this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery"); *Wacker v Gehl Co.*, 157 F.R.D. 58, 58 (W.D. Mo. 1994) (party seeking discovery of information which is not clearly relevant to the issues of the case must make some threshold showing of relevance).

## VI.    CONCLUSION

WHEREFORE, for the reasons set forth herein and in the previously filed Petition For Order Setting Aside Civil Investigative Demands And Incorporated Memorandum of Law, Petitioners respectfully request, pursuant to 31 U.S.C. § 3733(j)(2)(B), that the Court enter an order granting their petition to set aside the CIDs and denying the government's petition for enforcement. In the alternative, Petitioners request that the Court grant them permission to conduct limited discovery as indicated herein. Finally, in the event that the Court declines to set aside the CIDs and declines to permit Petitioners to conduct limited discovery, Petitioners respectfully request that the Court strictly limit the scope of questioning as set forth above.

    Respectfully submitted,

    _____
    Robert A. Kauffman
    Wayne C. Stansfield
    REED SMITH LLP
    2500 One Liberty Place
    1650 Market Street
    Philadelphia, PA 19103-7301
    215-851-8100
    215-851-1420  Facsimile

    Eugene Tillman
    Eric A. Dubelier
    Anne M. Devens
    REED SMITH LLP
    1301 K Street, N.W.
    Suite 1100 – East Tower
    Washington, D.C. 20005-3317
    202-414-9200
    202-414-9299 Facsimile

    Attorneys for Petitioners

Date:  June 17, 2002

**Certificate of Service**

      I hereby certify that I caused a true copy of the foregoing Petitioners' Response to United States' Petition To Enforce Civil Investigative Demands And Incorporated Reply To United States' Opposition to Petition To Set Aside Civil Investigative Demands to be served via hand-delivery this 17th day of June, 2002 on the following:

      James G. Sheehan
      Chief, Civil Division, United States Attorney
      Barbara Rowland
      Assistant United States Attorney
      United States Attorney's Office for the Eastern District of Pennsylvania
      615 Chestnut Street, Suite 1250
      Philadelphia, PA 19106

and via registered or certified mail, costs prepaid, this 17th day of June, 2002 on the following:

      John Ashcroft
      United States Attorney General
      United States Department of Justice
      950 Pennsylvania Avenue, N.W.
      Washington DC  20530-0001

                                                _____
                                                Wayne C. Stansfield