IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Jean Ritter, Dennis Webster,                  :
Robert Jastrzab, Randy Feldman,               :
Susan Sheuerman, Chris Moen,                  :
Paul F. Banta, and James Herrick,             :
                                              :
          Petitioners,                        :
                                              :          MISC. CASE NO. 02-127
          v.                                  :
                                              :
United States Department of Justice,          :
                                              :
          Respondent.                         :

UNITED STATES' REPLY TO PETITIONERS' RESPONSE TO
UNITED STATES'S PETITION FOR AN ORDER
TO ENFORCE CIVIL INVESTIGATIVE DEMANDS

In their response to the United States' Petition for an Order to Enforce Civil Investigative

Demands ("CIDs"), petitioners provide no basis for refusing to comply with the CIDs served on

them.  Their contention that the CIDs should not be enforced because the United States'

investigation of AdvancePCS is based on an improper motive is factually and legally incorrect

and unsupported.  AdvancePCS, through petitioners, should not be permitted to continue to delay

and hinder the United States' investigation by forcing the United States at every turn to seek

enforcement of its Inspector General subpoenas and CIDs.

I.       The Public Comments of AUSA Sheehan Do Not Constitute an Improper Purpose

Petitioners assert that improper motive is shown by the Department of Justice's

"improper public comments and attacks on the [pharmacy benefit management] industry in an

effort to force compliance with its investigative demands," Petitioners' Response at 5.  Also,

petitioners allege that the Department of Justice seeks to dictate federal health care policy.  Id. at

7.  Those assertions, which AdvancePCS states are based on public statements made by James G. Sheehan, Chief, Civil Division, U.S. Attorney's Office for the Eastern District of Pennsylvania, are entirely devoid of any specific facts demonstrating an improper purpose by the United States in conducting a fraud investigation of AdvancePCS.  All petitioners show is that Assistant U.S. Attorney Sheehan is serious about his commitment to communicate law enforcement concerns and obtain information about potentially industry-wide issues regarding drug manufacturer rebates and other secret payments made to pharmacy benefit management companies and their drug switching programs.[1]

The United States Court of Appeals for the Third Circuit has spoken clearly about the substantial threshold requirements petitioners must meet to challenge the United States' proper purpose in conducting this investigation.  In National Labor Relations Board v. Interstate Dress Carriers, Inc., 610 F.2d 99 (3d Cir. 1979), the Third Circuit stated that to obtain either discovery or a hearing regarding the alleged improper purpose underlying a subpoena, the moving party must do the following:

(1)    "It must come forward with facts suggesting that the subpoena is intended **solely** to serve purposes outside the purview of the jurisdiction of the issuing agency."

(2)    "The moving party must put into issue the good faith of the **agency** seeking enforcement, not simply the particular agent who managed the proceedings."

Interstate Dress Carriers, 610 F.2d at 112, citing, inter alia, United States v. LaSalle National Bank, 437 U.S. 298, 314-19 (1978) (emphasis added).  The Third Circuit further stated that

---

[1]    With respect to the program on June 4, 2002, that AdvancePCS describes as the "Salomon Smith Barney program," the United States emphasizes that the American Health Lawyers Association sponsored the program and invited Assistant U.S. Attorney Sheehan to participate.

unless the moving party meets these threshold requirements, the court should act summarily so that the moving party cannot use the enforcement proceeding "as a means for thwarting the expeditious discharge of the agency's responsibilities." Interstate Dress Carriers, 610 F.2d at 112.[2]

Petitioners have not remotely met either threshold requirement. While they have made several allegations, they have offered no facts suggesting that the CIDs are intended solely to serve purposes beyond the authority of the Department of Justice. Attacking the government counsel to avoid complying with subpoenas and CIDs is not a new tactic. "Unsupported allegations of bad faith and improper purpose are often made against regulatory agencies to hinder administrative investigations. . . . Such attempts to undermine the enforcement process should not be tolerated; the allegations of bad faith and improper purpose must be buttressed with specific facts." United States v. Juren, 687 F.2d 493, 494 (Temp. Emer. Ct. of App. 1982). Petitioners' contentions that the Department of Justice, based solely on the public statements of Assistant U.S. Attorney Sheehan, seeks to "force" them to comply with the CIDs and that it is trying to "dictate federal health care policy" do not amount to specific facts of improper purpose. Further, petitioners have not put into issue the good faith of the Department of Justice (and the Department of Health and Human Service and Office of Personnel Management, which are also

---

[2]      See also United States v. Witmer, 835 F. Supp. 201, 205 (M.D. Pa. 1993), vacated in part (on other grounds), 835 F. Supp. 208 (M.D. Pa. 1993) ("a subpoena recipient is entitled to limited discovery only after making a substantial and supported showing that enforcement of the subpoena would work an abuse to the Court's process"); United States v. McGovern, 87 F.R.D. 590, 591 (M.D. Pa. 1980) (refusing to permit discovery where subpoenaed party had not "sufficiently articulated facts that indicate a solely improper purpose").

involved in this investigation); they have focused entirely on the public statements of Assistant
U.S. Attorney Sheehan.[3]

Given petitioners' conclusory allegations of an improper purpose, neither discovery nor a
hearing is appropriate. Furthermore, the United States will not accede to petitioners' demand
that it supply an affidavit in support of its investigation merely because petitioners have made
bald allegations of bad faith. The Department of Justice has a duty to investigate and prosecute
health care fraud. The Inspector General subpoena and CIDs have simply been issued in
furtherance of that duty.

## II.    The United States' Investigation of AdvancePCS Is Based on a Legitimate Theory That Includes Economic Loss to the United States and Fraud by AdvancePCS

While the United States need not demonstrate AdvancePCS's potential False Claims Act
liability to investigate AdvancePCS, U.S. Mem. Law Supp. Pet. for Order to Enforce CIDs at 13-
16, as demonstrated below, petitioners' contention that the United States has no legitimate theory
of false claims liability is wrong.

The United States has advised AdvancePCS and petitioners that it is investigating
AdvancePCS's drug switching programs and its financial relationships with drug manufacturers,
including its solicitation and receipt of rebates and secret payments for putting certain brand
name drugs on AdvancePCS's preferred drug formularies. Petitioners contend that AdvancePCS
does not submit claims for payment to the United States within the meaning of the False Claims

---

[3]    See also United States v. Markwood, 48 F.3d 969, 984-5 (6th Cir. 1995) (allowing no discovery
where neither allegation nor showing was made that Attorney General had adopted any alleged improper motive of
the government attorney in issuing CID); Maccaferri Gabions, Inc. v. United States, 938 F. Supp. 311, 316-8 (D.
Md. 1995) (permitting no discovery where improper purpose allegations included, among other allegations, that
Antitrust Division had reached a preconceived conclusion of violations of law and that political influence had been
applied to initiate investigation of CID recipient).

Act.  Specifically, petitioners contend that the "government is not a party to the [Federal Employee Health Benefit] contracts and AdvancePCS makes no claims for payments to the government in connection with the contracts."  Petitioners' Response at 10.  No statement could be further from the truth.

A.    **OPM Pays Federal Funds to the Blue Cross Blue Shield Association for the Actual Claims of AdvancePCS**

The United States, through OPM, currently contracts with approximately 180 health benefit carriers that participate in the Federal Employees Health Benefit Program ("FEHBP").  June 21, 2002 Declaration of William J. Washington, Assistant Director for Systems, Finance and Administration, Retirement and Insurance Service, OPM (hereafter "Washington Decl."), ¶ 5, filed contemporaneously with this reply.  Many of these carriers, like the Blue Cross Blue Shield Association ("BCBSA"), contract with third parties, like AdvancePCS, to provide pharmacy benefit management services.  Id. ¶ 5.  The United States' relationship with BCBSA is useful to illustrate how claims submitted by AdvancePCS to BCBSA may subject AdvancePCS to False Claims Act liability.

BCBSA is an experience-rated plan.  Id. ¶ 9.  This means it is reimbursed by OPM, to the extent funds are available, for all its *actual paid claims and administrative expenses*, among other allowable charges.  Id.; see also 48 C.F.R. § 1602.170-7.  Furthermore, OPM's contract with BCBSA allows BCBSA to charge all costs to the contract that are *actual, allowable, allocable and reasonable*.  Id. ¶ 15(a); see also 48 C.F.R. § 1652.216-71(b)(1).  The contract also provides that contract costs must be classified as either benefits, administrative expenses, investment income or other charges.  Id. ¶ 15(b); see also 48 C.F.R. § 1652.216-71(b)(2).

Benefits are defined **as payments made and liabilities incurred** for covered health benefit services on behalf of FEHBP subscribers **less any refunds, rebates, allowances or other credits received.** Id. ¶ 15(c); see also 48 C.F.R. § 1652.216-71(b)(2)(i).

OPM sets the annual premiums for federal beneficiaries covered by BCBSA based on claims data received from BCBSA regarding utilization of medical, pharmacy, and other ancillary services. Washington Decl. ¶ 7. Approximately 72 percent of the premium is paid by the employing agency and 28 percent is paid by the employee. Id. ¶ 8. The employee and agency contributions are made to the Federal Employee Health Benefits Fund, which is a fund administered by OPM and whose fund balances are held by and invested through the United States Treasury. Id. ¶ 10.

To pay BCBSA, OPM establishes a Letter of Credit account for each carrier against which the carrier can draw to pay actual claims and administrative expenses. Id. ¶ 11. The Letter of Credit account is the method by which carriers receive the recurring premium payments and any amounts from the contingency reserve fund for that carrier. Id. ¶ 11; see also 48 C.F.R. § 1602.170-10.

BCBSA generally makes a claim against its Letter of Credit account on a daily basis. Washington Decl. ¶ 12. The daily claim is an aggregate of all allowable amounts BCBSA has incurred on behalf of the federal beneficiaries. Id. BCBSA must be able to support its drawdown against the Letter of Credit account with records substantiating that checks have been presented for payment for medical, hospital, and prescription drug claims and ancillary care. Id. ¶ 13. In this instance, that support would include evidence of BCBSA's payments to

AdvancePCS for payment of pharmacy claims, administrative expenses, and receipt of drug

manufacturer rebates.

      B.      **AdvancePCS Can Be Liable Under the False Claims Act for Causing BCBSA to Submit False or Fraudulent Claims**

      In light of the foregoing facts, petitioners are flatly wrong in their assertion that

AdvancePCS makes no claims for payment to the United States within the meaning of the False

Claims Act.  Title 31 U.S.C. § 3729(a)(2) provides for False Claims Act liability for indirectly

submitting false claims to the United States by knowingly making a false record or statement that

causes another to make a false or fraudulent claim for payment on the United States.  Here,

BCBSA is reimbursed by the United States for actual claims it has paid to AdvancePCS.  As

such, BCBSA's contract with OPM is essentially cost-reimbursable.  The fund the United States

draws on to pay BCBSA is a United States Treasury fund, managed by OPM and funded in large

part by federal agencies.  It is of no significance that the fund is comprised of fixed annual

premiums; all that matters is that the fund is at least in part comprised of federal money and that

BCBSA is reimbursed for all actual claims.[4]

      Furthermore, AdvancePCS's receipt of drug manufacturer rebates impacts the claims for

payment made by BCBSA.  Under its contract with OPM, any rebates received by BCBSA must

inure to the benefit of the FEHBP.  Washington Decl. ¶ 14.  BCBSA is required to offset all

rebates received from drug manufacturers or other vendors against the benefits it can claim from

OPM.  Id.  BCBSA's draws for benefits from the Letter of Credit account are to be reduced by

---

      [4]      If it were, however, of significance that federal agencies and employees pay fixed premiums for health benefits, OPM calculates those premiums annually based on prior experience and, therefore, any false claims made by AdvancePCS to BCBSA would falsely inflate the data that OPM reviews to calculate each year's premium.

any rebates received.  Id.  Therefore, AdvancePCS's obligation to pay 100 percent of the drug manufacturer rebates to BCBSA is an obligation of BCBSA to credit the United States for 100 percent of rebates.  Should AdvancePCS underpay or withhold rebates from BCBSA, then AdvancePCS may knowingly make a false record or statement that causes false or fraudulent claims for payment to be made by BCBSA to the United States.

      **C.**      **Fixed Premiums Are Not Relevant to False Claims Act Liability**

      Petitioners argue that Hutchins v. Wilentz, Goldman & Spritzer, 253 F.3d 176, 179 (3d Cir. 2001), cert. denied, 2002 WL 704677 (2002), supports its position by holding "the False Claims Act 'only prohibits fraudulent claims that cause or would cause economic loss to the government.'" Petitioners' Response at 10-11.  Contrary to petitioners' argument that Hutchins' holding is fatal to the United States' theory of liability, Hutchins is plainly not on point.  Even if it were, its holding is consistent with the United States' theory that AdvancePCS caused economic loss to the United States by causing BCBSA, among others, to submit false claims to the United States.

      In Hutchins, a paralegal at a New Jersey law firm filed a False Claims Act case against his employer for submitting inflated legal bills to be paid by a private third party for approval to the United States Bankruptcy Court.  253 F.3d at 179-81.  Payment of the inflated legal bills by a private third party would not have affected any money of the United States Treasury because no claim was submitted for payment by the United States.  Id. at 182.  The Third Circuit, upholding the district court's dismissal of the false claims counts, held that while a false statement had been made to the United States, no false claim was submitted to the United States and, therefore, the claim for payment could not cause economic loss to the United States.  Id. at 184.  Because of its

unusual facts, <u>Hutchins</u> stands for the limited proposition that the False Claims Act does not apply to claims for payment against private third parties submitted to the United States Bankruptcy Court for approval.

Petitioners further argue that <u>Hutchins</u> requires a loss suffered by the United States to be conditioned on payment for particular services provided by AdvancePCS, which petitioners contend would not be possible in this case because the services provided by AdvancePCS do not affect the fixed premium paid by the United States to BCBSA. Petitioners' Response at 12 n.11. As discussed above, regardless of the fixed premium, BCBSA and AdvancePCS, in turn, are paid for all actual claims submitted to the United States. As discussed below, fixed premiums as a matter of law are not relevant to False Claims Act liability. Moreover, it is well established that the United States need not suffer any damages to establish liability under the False Claims Act. <u>Rex Trailer Co. v. United States</u>, 350 U.S. 148, 153-4 (1956); <u>see also</u> <u>United States v. Neifert White Co.</u>, 390 U.S. 228, 233 (1968).

Congress explicitly stated in the 1986 amendments to the False Claims Act that it overruled <u>United States v. Azzarelli Const. Co.</u>, 647 F.2d 757 (7th Cir. 1981), to make it "clear the United States may bring an action whether the grant obligation is open-ended or fixed." S. Rep. No. 345, 99th Cong., 2d Sess., 1, <u>reprinted in</u>, 1986 U.S.C.C.A.N. 5266, 5280 (1986). Because the court in <u>Azzarelli</u> found there could be no liability for bidrigging when the federal contribution was fixed on an annual basis, rather than open-ended, Congress redefined "claim" in 31 U.S.C. § 3729(c) so that it was to be broadly interpreted. 1986 U.S.C.C.A.N. at 5287. Cases decided after the 1986 amendments follow this broad interpretation of "claim."

In <u>United States v. American Elevator Co.</u>, CIV. A. No. 88-8375, 1989 WL 11216 (E.D.

Pa., Feb. 10, 1989), the United States brought a False Claims Act action against defendants, an

elevator maintenance company and its owner, for submitting false claims about elevator repairs

and maintenance to the Philadelphia Housing Authority ("PHA") and the United States.  1989

WL 11216 *1.  Defendants sought dismissal because the alleged false claims were presented to

and paid by PHA (even though part of those funds were federal) and, therefore, the United States

Treasury was not impaired.  <u>Id.</u> at *2.  Judge Waldman of this Court found flawed defendants'

argument that payment by PHA meant the United States Treasury remained intact because

defendants' argument ignored the 1986 amendments to the False Claims Act.  <u>Id.</u> at *3.

According to the court, by broadly defining "claim" in the amendments, "Congress intended to

enable the government to sue individuals or entities for submitting false claims not only directly

to the United States government but to 'grantees,' such as the PHA, or 'contractors' hired by the

government, as well.  That this was the intent of Congress appears clear from the legislative

history of the [False Claims Act] amendments which characterized the <u>Azzarelli</u> decision as 'a

narrow reading of the Act.'" <u>Id.</u> at *4 (citations omitted).  <u>See also</u> <u>United States ex rel. Koch v.</u>

<u>Koch Ind., Inc.</u>, 57 F. Supp. 2d 1122, 1128 (N.D. Okla. 1999) ("Congress' intent in expanding

and amending the [False Claims Act] in 1986 was to enable the statute to reach further to protect

the Government from fraud due to false filings. . . . [P]articularly that section which defines a

'claim,' appears to have been constructed with flexibility and the possibility of permissive

interpretation in mind"); <u>United States ex rel. Costa v. Baker & Taylor, Inc.</u>, No. C-95-1825-

VRW, 1998 WL 230979 *7 (N.D. Cal. Mar. 20, 1998) (in case involving federal grants to

libraries under the Library Act, 20 U.S.C. § 351 <u>et seq.</u>, court refused to dismiss False Claims

Act complaint against book wholesaler and distributor who overcharged libraries where defendants argued there was no nexus between fraud and federal funding); Wilkins v. State of Ohio, 885 F. Supp. 1055, 1062-63 (S.D. Ohio 1995) (definition of "claim" under 31 U.S.C. § 3729(c) "makes no distinction between money provided as a fixed sum and money provided under an open-ended program, but rather is broad enough to include any request for money which was originally obtained from the United States Government").[5]

### D.    The United States Is Investigating Whether AdvancePCS Made False Representations to BCBSA, Among Other Plans, About Rebates

AdvancePCS had originally argued in its Petition to Set Aside the CIDs that it could never make a "false representation" as required by the False Claims Act because it does not provide health plan administrators with any information affecting federal funding.  The United States contradicted AdvancePCS by providing an example of an alleged "false representation" made by AdvancePCS regarding whether it paid earned drug manufacturer rebates to health plans after Rite-Aid, its prior owner, improperly diverted those rebates to pay its vendors. AdvancePCS now contends that this U.S. Attorney's Office Civil Division *knows* that this assertion is wrong by virtue of Rite-Aid's cooperation with a criminal investigation in the Middle District of Pennsylvania.

---

[5]       Petitioners also argue that the United States cannot bring a reverse false claims action under 31 U.S.C. section 3729(a)(7) because AdvancePCS's obligation to pass on rebates is to BCBSA, not to the United States.  Petitioners' Response at 12.  Again, petitioners are wrong.  Just like it can bring a false claims action against a party who creates a false record to cause another to make false claims, the United States can bring an indirect reverse false claims action against a party who creates a false record to cause another to make a reverse false claim. See United States ex rel. Koch v. Koch Ind., Inc., 57 F. Supp. 2d 1122, 1128 (N.D. Okla. 1999) (because 31 U.S.C. section 3729(a)(7) permits reverse false claims and section 3729(c) permits indirect false claims, Congress intended to permit indirect reverse false claims).

Again, the United States set the record straight. This U.S. Attorney's Office Civil Division **does not know** whether AdvancePCS paid the earned rebates to the health plans after Rite-Aid diverted those rebates. AdvancePCS's cooperation with the U.S. Attorney's Office Criminal Division in the Middle District of Pennsylvania was in connection with that office's criminal investigation of Rite-Aid and its executives. Four former Rite-Aid executives were indicted on Friday, June 21, 2002, in the Middle District of Pennsylvania for, among other conduct, lying about how Rite-Aid had booked the rebate payments earned or to be earned by AdvancePCS from two drug manufacturers. Information relating to those rebates, to the extent it can be known by this U.S. Attorney's Office Civil Division in light of Rule 6(e), Fed. R. Crim. P., did not demonstrate whether all earned rebates were paid by AdvancePCS as required under each plan's contracts. See Markwood, 48 F.3d at 983-4 ("one of Congress's purposes in creating a false claims CID was to enable the Department of Justice to obtain information no longer available" after case law prohibited disclosure of grand jury material without court order). For that reason, this office continues to investigate, among other things, whether the diverted rebates were ultimately paid to the health plans.

## III.    CIDs Should Not Be Limited to Government Programs

Petitioners argue that if the Court does not order the CIDs to be set aside, that the Court should limit the scope of the CIDs' examination to the four situations where the United States funds AdvancePCS's services – the Federal Employees Health Benefits Program, the Mail Handlers' Benefit Program, Medicaid Managed Care Organizations ("MCOs"), and Medicare Plus Choice MCOs. The United States asks the Court to reject AdvancePCS's effort to control the United States' investigation.

AdvancePCS's financial relationship with drug manufacturers affects all of its contracts with health plans; it affects how the health plans are used to increase the market share of the brand name drugs that are on AdvancePCS's preferred drug list; it affects how much the health plans pay in premiums and how much they get back in rebates; and, also, it affects how their patients get switched from a non-preferred drug to a preferred drug, not always with their best health and financial interests in mind. That information sought by the United States cuts across all health plans, and information from all health plans may well be needed to fully understand the effect of AdvancePCS's financial deals with the drug manufacturers.

For that very reason, petitioners, whose jobs involved negotiating and administering the rebate and other marketing program contracts with the drug manufacturers, could not be directed to answer questions only to the extent they involve federally funded health plans. Similarly, to the extent petitioners have information about how AdvancePCS worked with chain pharmacies to increase the market share of certain brand name drugs on its preferred drug list, that information will apply across the board to all plans contracting with AdvancePCS.

IV.    **Conclusion**

For the reasons set forth in the Petition for an Order to Enforce the CIDs, its supporting memorandum and this reply brief, the United States respectfully requests this Court to grant the petition and order petitioners to appear for the taking of oral testimony within 14 days or as

directed by the United States false claims investigators.  Additionally, the United States

respectfully requests the Court to deny petitioners' Petition for an Order Setting Aside the CIDs.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney


_____

JAMES G. SHEEHAN
Assistant United States Attorney
Chief, Civil Division


_____

BARBARA ROWLAND
SUSAN R. BECKER
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8200 Telephone
(215) 861-8349 Facsimile

-14-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the _____ day of June, 2002, I caused true and correct copies of

the foregoing Reply Brief and Declaration of William J. Washington to be served by first class

mail, postage prepaid, upon the following:

> Robert A Kauffman, Esq.
> Wayne C. Stansfield, Esq.
> Reed Smith Shaw & McClay
> 2500 One Liberty Place
> 1650 Market Street
> Philadelphia, PA 19103-7301
>
> Eugene Tillman, Esq.
> Eric A. Dubelier, Esq.
> Reed Smith Shaw & McClay
> 1301 K Street, N.W.
> Suite 1100 – East Tower
> Washington, D.C.  20005-3317

_____
Barbara Rowland